UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cr-00007-JAW |
| | ) | |
| DOUGLAS GORDON | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

An inmate serving a five-year term of imprisonment moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The Court dismisses the motion without prejudice because the inmate's health does not present extraordinary and compelling reasons for compassionate release. In reaching this conclusion, the Court weighs the section 3553(a) factors against release in light of the pervasiveness and longevity of the crimes, the inmate's insistence that he did not commit the crimes of which he was convicted and instead was the subject of a vindictive federal prosecution and an odd insinuation about the investigation and prosecution of an unrelated theft ring, and finally the fact that the inmate has yet to serve a substantial portion of his sentence.

## I.    BACKGROUND

### A.    Factual Background

On January 17, 2019, a federal grand jury indicted Douglas Gordon for two counts of criminal copyright infringement, alleged violations of 17 U.S.C. §

506(a)(1)(B) and 18 U.S.C. § 2319(a). [1] *Indictment* (ECF No. 2.).  On April 17, 2019, the grand jury issued a superseding indictment including the initial two counts of criminal copyright infringement and adding one count for a mail fraud scheme and artifice, an alleged violation of 18 U.S.C. § 1341.  *Superseding Indictment* (ECF No. 44).  A seven-day jury trial was held from October 21, 2019 to October 29, 2019, and on October 29, 2019, the jury issued a guilty verdict on all three counts.  *Jury Verdict* (ECF No. 162).

At the December 22, 2020, Zoom sentencing hearing the Court made the following guideline calculations, grouping Counts 1, 2, and 3:  Mr. Gordon's guideline sentencing range was from 108 to 135 months, the guideline term of supervised release was one year as to Counts 1 and 2 and one to three years as to Count 3, a fine range of $30,000 to $250,000, a mandatory special assessment of $300, and mandatory restitution.  *Notice of Filing of Official Tr. of Proceedings* at 45:21-46:8 (ECF No. 222) (*Sentencing Tr.*); *Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* (ECF No. 217).  The Court sentenced Mr. Gordon to five years (60 months) imprisonment (36 months on Counts 1 and 2 and 60 months on Count 3 to be served concurrently), three years of supervised release, no fine, restitution in the amount of $554.90, and a $300 special assessment.  *J.* at 2-3, 6 (ECF No. 216); *Sentencing Tr.* at 74:5-18.  The Court recommended that Mr. Gordon be placed in a BOP facility that can assist his medical needs.  *Sentencing Tr.* at 74:20-22.  Mr. Gordon is now 55 years

---

[1]    A detailed account of the factual history can be found at *United States v. Gordon*, 37 F.4th 767, 769-70 (1st Cir. 2022).

old and is incarcerated at FMC Devens.  Fed. Bureau of Prisons, *Find An Inmate*, https://www.bop.gov/inmateloc/ (last visited Sept. 26, 2022).

### B.    Procedural History

On January 6, 2021, Mr. Gordon appealed his conviction and sentence to the Court of Appeals for the First Circuit, *Notice of Appeal* (ECF No. 218), arguing the sentencing calculation was faulty and there was insufficient evidence for counts one and two.  *United States v. Gordon*, 37 F.4th 767, 769 (1st Cir. 2022) (ECF No. 227).  On June 26, 2022, the First Circuit affirmed the judgment of the district court and upheld the verdicts and sentence.  *Id.* at 775.

On August 1, 2022, Mr. Gordon filed a pro se motion for compassionate release.[2]  *Mot. for Compassionate Release re: First Step Act* (ECF No. 230) (*Def.'s Mot.*).  On August 4, 2022, the Court appointed counsel for Mr. Gordon.  *Appointment of Counsel and Scheduling Order* (ECF No. 233).  On August 15, 2022, Mr. Gordon filed his intent to proceed on the initial petition.  *Notice of Intent to Proceed on the Initial Petition* (ECF No. 234).  On August 22, 2022, the Government responded in opposition to Mr. Gordon's motion for compassionate release.  *Gov't's Resp. to Mot. for Compassionate Release* (ECF No. 235) (*Gov't's Opp'n*).  Mr. Gordon replied on September 20, 2022.  *Reply to Response* (ECF No. 239) (*Def.'s Reply*).

## II.    THE PARTIES' POSITIONS

### A.    Douglas Gordon's Motion for Compassionate Release

---

[2]     Mr. Gordon satisfies the exhaustion requirement because he submitted a request to the warden of FMC Devens for compassionate release on August 31, 2021, which was denied.  *Def.'s Mot.*, Attach. 2, *Inmate Request for Compassionate Release Consideration* (ECF No. 230).

Mr. Douglas submits that "[t]he growing COVID-19 pandemic, which public experts and policy makers recognize is especially dangerous in the confines of correctional institutions, in tandem with Mr. Gordon's medical conditions, harsher/punitive conditions and incarceration at FMC Devens is an extraordinary and compelling circumstance." *Def.'s Mot.* at 1.  He further submits that "combined with the totality of the circumstances in this case, [his circumstances] warrant an immediate reduction to time served." *Id.*

He contends that his risk factors include "(1) High Blood Pressure[,] (2) Cardiovascular[,] (3) Immune Suppressed[, and] (4) History of Kidney Disease" and lists his "additional medical and psychological challenges" as "[d]ifficulty adjusting to prison life with prosthetic leg [and d]ifficulty managing both high blood pressure and depression medications." *Id.*  He explains to the Court that he has "limited self-care as [he] need[s] assistance with day to day activities . . . [and is] in a bed or chair for more than 50% of waking hours," due in part to the fact that he cannot "control when [he] use[s his] prosthetic leg" while imprisoned.  *Id.*, Attach. 3, *Extraordinary/Compelling Circumstances for Compassionate Release.*

He presents concerns regarding FMC Devens' management of the COVID-19 pandemic, alleging specifically that in response to "a severe outbreak at the Camp in January 2022 . . . [e]ven though Mr. Gordon and approx. 10 or 12 other inmates tested negative, they were placed in the same isolation units as those who tested positive." *Id.* at 2.

Mr. Gordon asks the Court to consider the "unique" nature and circumstances of the offense.  *Id.*  He contends that "[f]rom the very beginning . . . many things didn't add up . . . first and foremost: [w]hat was the motivation of the US Government's interest in prosecuting a case involving . . . 'out of print' motion pictures with no mainstream ready market and unlikely to ever to have one?"  *Id.*  He explains how "he decided to file 'Freedom of Information/Access Act(s)' Requests with the Maine State Police, the Brewer Police Department, and the Maine offices of the Department of Homeland Security and the Department of Justice," *id.* at 3, but that "after nearly a year of letter exchanges and ignored requests, no real information has been recovered . . . [p]lenty of smoke [screen], but no real answers to the requests for information."  *Id.*

He argues that "even the hint of circumstantial evidence of a pretextual investigation and a vindictive prosecution should be considered as part of the nature and circumstances of a case that is the first of its kind in the United States."  *Id.* at 4.  He further argues that the alleged evidence "as circumstantial as it is, could be as extraordinary and compelling as the new medical issues the defendant is experiencing at FMC Devens."  *Id.*

In support of his request for compassionate release, Mr. Gordon further emphasizes that he "has been a model prisoner who has found ways to be productive in the challenging environment of modern incarceration."  *Id.* at 5.  He highlights that "[b]efore reporting to FMC Devens in 2021, [he] was volunteering at his hometown library to help the librarians digitize their one-of-a-kind historical photographs and

5

rare documents." *Id.* at 4.  He also notes that during his incarceration, he "has been a dog handler for the NEADS program, which trains service dogs, he has volunteered for the Community Outreach Program . . . [and h]e has actively programmed with classes like the Non-Residential Drug Abuse Program." *Id.*  Mr. Gordon indicates that he works in the kitchen and "has no disciplinary actions and also maintained a minimum recidivism score (the lowest score possible)." *Id.*

He concludes by citing *Concepcion v. United States*, 142 S. Ct. 2389 (2022), arguing that "[l]ooking at all of the above evidence in the light of the Concepcion decision puts a potential new spin on re-sentencing the Defendant through the form of a Compassionate Release." *Id.* at 5.

### B.     The Government's Opposition

The Government first addresses Mr. Gordon's COVID-19 argument, positing that Mr. Gordon's complaints "about the [COVID] measures themselves" at FMC Devens "in addition to being misplaced, provide nothing unique or compelling as to the defendant's case." *Gov't's Opp'n* at 9.  The Government notes that "there are currently no COVID-19 cases at FMC Devens [and i]nmates who want the vaccination receive it.  *Id.*  The Government argues that "'the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release.'"  *Id.* (quoting *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 WL 3104043, at *5 (D. Me. June 11, 2020)). Acknowledging that "[s]ome of [Mr. Gordon's] conditions are CDC risk factors for adverse outcomes from COVID infection," *id.* at 9, the Government cites a panoply of

cases and contends that the "risk associated with [Mr. Gordon's] underlying medical conditions do[es] not give rise to an extraordinary and compelling circumstance supporting compassionate release.  *Id.* at 9-10.

The Government next addresses Mr. Gordon's assertion that he is having "[d]ifficulty adjusting and balancing medication."  *Id.* at 10.  The Government contends that these "general complaints about being in BOP custody . . . are not properly addressed in a compassionate release proceeding . . . [but that t]o the extent they are cognizable as Eighth Amendment violations, such claims must be brought in the district of confinement under appropriate civil procedure.  *Id.* at 10-11.

The Government then turns to the section 3553(a) factors, arguing that these factors weigh "strongly against early termination of [Mr. Gordon's] sentence."  *Id.* at 1.  The Government first addresses the ongoing danger that Mr. Gordon if released would pose to the public.  The Government argues that the "primary danger posed by [Mr. Gordon] is his willingness to commit largescale consumer-level fraud . . . [and his] refusal to even acknowledge this conduct as the primary factor in his current sentence indicates this danger is unabated."  *Id.* at 11.  The Government reminds the Court that "Mr. Gordon acknowledged getting hundreds of complaints, so many he had to hire back one of his employees to manage them all . . ., referred to these dissatisfied customers as 'PKs' for 'problem kids,' and blamed the numerous complaints on the normal course of business."  *Id.* at 12.  The Government concludes that "there was very little customers, copyright holders, or law enforcement could do to dissuade Mr. Gordon from defrauding the public [and j]ail appears, under the

7

circumstances, to be the only sure way to protect the public from Mr. Gordon's fraud." *Id.*

As for deterrence, the Government posits that "Mr. Gordon chose to continue his criminal activity in open defiance of the law for years after he was notified of the investigation, and . . . [s]ince Mr. Gordon continues to ignore his own wrongful actions, it is very unlikely that he has been personally deterred from further similar conduct." *Id.* at 14. The Government concludes that "[t]erminating Mr. Gordon's sentence at this time would also undermine respect for the law and would repudiate the seriousness of the years-long, extensive, mass-marketed, and brazen fraud scheme." *Id.*

## C. Douglas Gordon's Reply

Mr. Gordon first reminds the court that he has "requested Compassionate Release Consideration based on Medical Circumstances: Medically Debilitated, asserting that he was only capable of limited self-care and confined to a bed or chair more than 50% of his waking hours, which substantially negatively impacts his activities of daily living." *Def.'s Reply* at 1. He submits that as an amputee, he suffers from "sores on his stump" and "with the ongoing standing demands [in prison], his sores never have the opportunity to heal. *Id.* at 6.

Mr. Gordon then turns to his health condition regarding his amputated leg and submits that "COVID-19 disproportionately affects amputees: 'people living with limb loss and limb difference are at higher risk for COVID-19.'" *Id.* at 7 (quoting *Id.*, Attach 5, *Amputees and COVID*). He further submits that he "is not receiving

adequate medical treatment, despite frequent requests for the same," and contends that it is "gravely inappropriate to fail to provide an individual with proper medical treatment, especially treatment of his stump sores [as t]his lack of treatment may prove to be fatal." *Id.* at 8.  He argues that "the overriding factor under § 3553(a) that was not present at the time of sentencing is Mr. Gordon's chronic right leg stump sores." *Id.* at 9.  He contends that "Mr. Gordon's health at the time of sentencing provided no indication that the sentence would be, in effect, a sentence to live with potentially life-threatening medical complications due to the necessity of having to stand at least four hours straight while at work in the kitchen at the correctional facility." *Id.*

Mr. Gordon reiterates his strong community involvement at FMC Devens, *id.* at 5-6, noting that he "has signed up for any and all programming that is recommended to him or places his name on the waiting list if the program is already full," *id.* at 6, and submits that he "provided the Medical Social Worker with information regarding his proposed Release Plans, including . . . his family support in the community . . .." *Id.* at 2.  He concludes that his "physical and mental conditions following his health decline realistically forecloses a probability of dangerous recidivism." *Id.* at 10.

## III.   LEGAL STANDARD

"Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when 'extraordinary and compelling reasons warrant such a reduction.'" *United States v. Ruvalcaba,* 26 F.4th 14, 18 (1st Cir. 2022).  "To grant the motion, the district

court must find both that the defendant has presented an 'extraordinary and compelling' reason warranting a sentence reduction, . . . and that 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *Id.* at 18-19 (quoting § 3582(c)(1)(A)).

The United States Sentencing Commission's current policy guidance[3] for addressing compassionate release motions brought by the Director of the BOP, issued pursuant to Guideline § 1B1.13, "was last modified in November of 2018—before the F[irst] S[tep] A[ct] (FSA) amended the compassionate-release statute to allow for prisoner-initiated motions." *Id.* at 20. In *United States v. Ruvalcaba*, the First Circuit resolved that district courts are not constrained by the Sentencing Commission's 2018 policy statement in adjudicating prisoner-initiated motions for compassionate release. *Id.* at 22-23 (emphasizing that § 603(b) of the FSA "effected a paradigm shift in how compassionate release would function" and that "[g]iven the profound nature of this paradigm shift, it is fair to say that the 'purposes' and 'appropriate use' of the compassionate-release statute have swelled beyond those that inhered in the statute when the Sentencing Commission issued its original policy statement").

The First Circuit clarified that the absence of an applicable policy statement does not leave the district court's discretion "unbounded," rather it remains

---

[3]     The Sentencing Commission's list of "four categories of extraordinary and compelling reasons: medical conditions; age; family circumstances; and a catch-all for other reasons deemed appropriate by the BOP. . . remains unchanged today." *Ruvalcaba*, 26 F.4th at 20 (citing U.S.S.G. § 1B1.13 cmt. n.1 (A) – (D)). "[S]ection 1B1.13 also requires a finding that the defendant is not dangerous in order to grant compassionate release based on extraordinary and compelling reasons." *Id.* at 19-20 n.5.

"circumscribed by statutory standards, which obligate the district court to find a reason that is both 'extraordinary and compelling.'" *Id.* at 23 (citing *United States v. Canales-Ramos*, 19 F.4th 561, 566 (1st Cir. 2021) ("[T]he 'extraordinary and compelling' standard is logically guided by the plain meaning of those terms")). "[M]oreover, the current policy statement—though not 'applicable'—nonetheless may serve as a non-binding reference." *Id.*

Thus, until the Sentencing Commission updates its guidance applicable to prisoner-initiated motions, "the district courts will have to assess prisoner-initiated motions for compassionate release primarily through the lens of the statutory criteria." *Id.* "Ultimately, . . . it is within the district court's discretion—constrained only by the statutory criteria[4] and any applicable policy statement—to make that [individualized assessment of a myriad of factors], case by case." *Id.* at 27-28. A court "may consider any complex of circumstances raised by a defendant as forming an extraordinary and compelling reason warranting relief." *Id.* at 28.

If the prisoner meets the extraordinary and compelling circumstances standard necessary to justify compassionate release, "the district court must [also] consider any applicable section 3553(a) factors," *id.* at 19, to "determine whether, in its discretion, the reduction . . . is warranted in whole or in part under the particular circumstances of the case." *United States v. Saccoccia*, 10 F.4th 1, 4 (1st Cir. 2021)

---

[4] The only "explicit limitation on what may comprise an extraordinary and compelling reason" is "that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" *Id.* at 25 (alterations in *Ruvalcaba*) (quoting 28 U.S.C. § 994(t)).

(omission in *Saccoccia*). In particular, before granting the petition, a court must assess,

> [t]he nature and circumstances of the offense and the history and characteristics of the defendant, the need . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; [and] to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "Though the [§] 3553(a) factors may serve as an independent basis for a district court's decision to deny a compassionate-release motion," they "need only be addressed if the court finds an extraordinary and compelling reason favoring release." *Saccoccia*, 10 F.4th at 8.

The movant bears the burden of proving that he is entitled to a sentence reduction, and the Court has discretion to determine whether "the reduction . . . is warranted in whole or in part under the particular circumstances of the case." *United States v. Texeira-Nieves*, 23 F.4th 48, 52 (1st Cir. 2022) (quoting *Saccoccia*, 10 F.4th at 4); *see Saccoccia*, 10 F.4th at 4 (stating that the First Circuit's standard of review "[r]ecogniz[es] that the compassionate-release statute provides that a district court's decision to grant or deny a compassionate-release motion is discretionary").

## IV.   DISCUSSION

### A.   Extraordinary and Compelling Reasons

To grant Mr. Gordon's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. Mr. Gordon submits that his underlying health conditions combined with

12

the risk of contracting COVID-19 create such a circumstance warranting a sentence reduction. *Def.'s Mot.* at 1.

The Court first considers Mr. Gordon's current health status and risk profile. Mr. Gordon contends that his risk factors include "(1) High Blood Pressure[,] (2) Cardiovascular[,] (3) Immune Suppressed[, and] (4) History of Kidney Disease." *Id.* The record before the Court partially supports his claims, confirming that as of September 26, 2019, his "ongoing medical issues" were: "essential hypertension; mixed hyperlipidemia; history of cerebrovascular incident; insomnia; knee pain; left inguinal pain; and osteoarthritis of the left knee." *U.S. Probation Filing as to Douglas Gordon*, (ECF No. 232) Attach. 3, *Presentence Report* ¶ 53B (*PSR*). His PSR cited medical records state that his "historical issues" are: "amputation above the knee; cholecystectomy; impaired glucose tolerance; kidney stones; lateral epicondylitis of the left humerus; morbid obesity; scoliosis; seizure disorder; and transient ischemic attack." *PSR* ¶ 53B. Mr. Gordon was born without a right knee and with other defects in his brain, toes, and fingers. *PSR* ¶ 53. As of June 2020, Mr. Gordon was prescribed seven blood thinning medications for his brain defect. *Id.* He suffers from chronic kidney problems and was "in a coma with kidney failure for seven weeks in 2014 before physicians discovered he had a birth defect in his brain that caused [his] seizures." *PSR* ¶ 50. In 2014, he was diagnosed with "acute kidney injury most probably secondary to acute tubular necrosis." *PSR* ¶ 53B.

In his motion, Mr. Gordon lists four medical conditions as CDC risk factors. *Def.'s Mot.* at 1; Attach. 3, *Extraordinary/Compelling Circumstances for a*

13

*Compassionate Release* at 1 ("These medical problems make me vulnerable to CDC Risk Factors High Blood Pressure, cardiovascular, immune sup[p]ressed[,] and history of kidney disease"). However, Mr. Gordon has not provided the Court with either his BOP or outside medical records, and therefore, other than confirming the past existence of some of these conditions as set forth in the PSR, the Court is unable to accurately assess his current state of health. The Court has done its best with limited information.

Regarding high blood pressure or hypertension, CDC guidance is somewhat equivocal. The CDC says that "possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." *CDC COVID Med. Conditions*. This advice is distinct from other heart conditions such as heart failure, coronary artery disease, and cardiomyopathies, which the CDC says are more likely to cause someone to get very sick from COVID-19. *Id.* Mr. Gordon's 2019 medical records as conveyed through his PSR confirm his "essential hypertension," although there is no indication of its severity. *PSR* ¶ 53B. The PSR also lists a history of hyperlipidemia, or high cholesterol, but the CDC does not mention hyperlipidemia as a COVID risk factor. *Id.* The Court has considered Mr. Gordon's hypertension as a possible risk factor if he were to contract COVID.

Although Mr. Gordon lists "cardiovascular" as a risk factor in addition to hypertension, the records before the Court do not mention his cardiovascular condition as a separate diagnosis for Mr. Gordon. Because it is unclear to what disease—other than high blood pressure—Mr. Gordon refers to when he lists

14

"cardiovascular" as a risk factor, the Court treats Mr. Gordon's risk of hypertension and cardiovascular disease together.

Similarly, even though Mr. Gordon says that he is immunocompromised, the Court finds no support in the record for Mr. Gordon's claim or, beyond the general category of being immunocompromised, no specific diagnosis to this effect or an indication as to it severity.  The Court has not considered this unsupported diagnosis in considering his motion.

Turning to his kidney disease, the CDC initially classified only those individuals with chronic kidney disease who required dialysis as being at heightened risk for severe illness from COVID-19.  However, in the newest CDC iteration, having chronic kidney disease "of any stage increases" a person's risk for severe illness from COVID-19.  *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited October 3, 2022).  The Court assumes that Mr. Gordon falls in a heightened risk category from his chronic kidney disease.

Despite his increased risk, however, Mr. Gordon's medical conditions do not present an "extraordinary and compelling" reason for early release.  The First Circuit explained that "not every complex of health concerns is sufficient to warrant compassionate release[, and] this remains true even in the midst of the COVID-19 pandemic."  *Saccoccia*, 10 F.4th at 5.  "It is only if 'the defendant's situation constitutes the type of 'extreme hardship' that the compassionate-release statute is designed to ameliorate' that a sentence reduction is warranted."  *United States v.*

15

*Sealy*, No. 2:16-cr-00036-NT, 2022 U.S. Dist. LEXIS 22449, at *6 (D. Me. Feb. 8, 2022) (quoting *Saccoccia*, 10 F.4th at 4).

The enhanced danger of COVID-19, especially for individuals with certain health conditions, is clear; however, Mr. Gordon's risk, based on his alleged conditions, does not warrant release. *See United States v. Cooke*, No. 20-cr-10126-ADB, 2022 U.S. Dist. LEXIS 103911, at *7 (D. Mass. June 10, 2022) (collecting cases in which district courts across the country have found that even with the presence of medical conditions that increase an inmate's risk of serious illness from COVID-19, the risk of contracting COVID-19 alone is not sufficient to warrant early release).

The Court also considers Mr. Gordon's risk based on the current prevalence of COVID-19 at FMC Devens. As of October 27, 2022, there are six positive cases among the 971 total inmates and eight positive cases among staff at the facility. *COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Oct. 27, 2022); *FMC Devens*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/dev/ (last visited Oct. 27, 2022). FMC Devens is currently following Level 2 Operations procedures to combat the spread of COVID. *Level Specific Modifications*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Oct. 3, 2022).

The Court's conclusion is further supported by Mr. Gordon's vaccination status. Medical records from the BOP indicate that as of July 2021, Mr. Gordon received both doses of the Pfizer vaccine. *Gov't Opp'n*, Attach. 4, *Bureau of Prisons*

*Health Services Immunizations* at 1.  He refused a booster shot in February 2022. *Id.*, Attach. 5, *Bureau of Prisons Health Services Immunizations* at 1.  The CDC states that "COVID-19 vaccines available in the United States are effective at preventing people from getting seriously ill, being hospitalized, and dying" from COVID.  *Stay Up to Date with Vaccines Including Boosters*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html.   Mr. Gordon's refusal of a booster shot does not render his circumstance extraordinary and compelling.  *See United States v. Pelletier*, No. 2:12-cr-00119-GZS, 2021 U.S. Dist. LEXIS 76078 (D. Me. Apr. 21, 2021) (holding a defendant's own refusal of the COVID-19 vaccine "significantly weigh[s] against a finding that [the defendant] presents extraordinary and compelling circumstances based on his risk of serious illness from COVID-19").

Mr. Gordon alleges more specifically he has "[d]ifficulty adjusting to prison life with a prosthetic leg," *Def.'s Mot.* at 1, because he has "limited self-care as [he] need[s] assistance with day to day activities . . . [and is] in a bed or chair for more than 50% of waking hours," due in part to the fact that he cannot "control when [he] use[s his] prosthetic leg" while imprisoned.   *Id.*, Attach. 3, *Extraordinary/ Compelling Circumstances for Compassionate Release*.  Mr. Gordon also explains that he has "[d]ifficulty managing both high blood pressure and depression medications."  *Id.* at 1.

Although the Court acknowledges these complaints, the Court finds they do not make Mr. Gordon an appropriate candidate for compassionate release in part

because these factors were already present at sentencing and they do not constitute "extraordinary and compelling" reasons for his release.  In fact, the Court specifically considered Mr. Gordon's physical condition regarding his right leg when imposing his substantially reduced sentence of 60 months from the guideline range of 108 to 132 months.  *Sentencing Tr.* at 62:4-5; 72:13-17.  In imposing a sentence markedly below the guideline range, the Court mentioned that "his array of medical problems makes him more susceptible to [COVID]-19."  *Id.* at 72:14-17.  Indeed, the Court considered the COVID-19 pandemic and Mr. Gordon's health risks in granting Mr. Gordon a delayed self-report to the BOP of six months after sentencing.  *Id.* at 81:9-24.

The Court recognizes that COVID-19 has impacted Mr. Gordon's prison experience, including increased time in isolation to prevent the spread of the virus.  *Def.'s Mot.* at 2.  However, "the pandemic, and its subsequent natural impacts in and of themselves do not present an 'extraordinary and compelling' justification for [an inmate's] release."  *United States v. Stone*, No. 1:08-cr-00006-JAW, 2021 U.S. Dist. LEXIS 213599, at *20 (D. Me. Nov. 4, 2021); *see also United States v. Davis*, No. 2:15-cr-00186-GZS, 2021 U.S. Dist. LEXIS 171136 at *3 (D. Me. Sept. 9, 2021) ("The Court acknowledges that the ongoing pandemic is an extraordinary event for our entire country and has been especially challenging for the Bureau of Prisons.  However, it is against this backdrop that a defendant must show individualized extraordinary and compelling reasons why he should not be required to serve the remainder of his sentence").

Finally, of course, as time goes by and the pandemic becomes endemic, less virulent, especially for the vaccinated, and less lethal due to the development of medicines such as antiviral and monoclonal antibody treatments, the impact of COVID-19 on BOP operations (and Mr. Gordon's prison experience) may become less dramatic. *See COVID-19 Treatments and Medications, CDC,* https://www.cdc.gov/coronavirus/2019-ncov/your-health/treatments-for-severe-illness.html (last visited Oct. 26, 2022).

## B.     The Section 3553(a) Factors

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the Court considered whether the § 3553(a) factors justify Mr. Gordon's release at this time.  They do not.  Although the Court considered each factor, the Court discusses only the most pertinent factors: the nature and circumstances of Mr. Gordon's offenses, the need to protect the public from future crimes of the defendant, and adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(1).

First, the Court notes the long-term and pervasive nature of Mr. Gordon's crime.  Mr. Gordon's scheme to defraud ran for nearly five years.[5]  Mr. Gordon did not cease his criminal behavior even when repeatedly warned that his actions were illegal.    As  the  First  Circuit  summarized,  "[d]espite  the  complaints,  the investigations, and the letters from state and federal authorities, Mr. Gordon was undeterred." *Gordon*, 37 F.4th at 770.  After the Motion Picture Association sent Mr.

---

[5]       Count 3, the mail fraud count, alleged a scheme to defraud "[from] about April, 2014 to about January, 2019." *Superseding Indictment* at 3.

Gordon a cease-and-desist letter, he "doubled down by employing an out-of-state vendor to conceal his operations." *Id.*

Second and most surprising is Mr. Gordon's continued lack of acceptance of responsibility and remorse. Mr. Gordon elected not to allocute at his sentencing hearing. *Sentencing Tr.* at 60:5-14. But he testified at his trial. *Tr. of Proceedings*, *VII* at 1365:15-1553:2. Mr. Gordon justified his actions based on his understanding of concepts of fair use, *id.* at 1377:24-1383:4, and orphan work, *id.* at 1383:13-19, 1386:14-1389:18, and he testified that he had not violated the law. *Id.* at 1377:11-19. Despite his testimony, the jury found him guilty of two counts of copyright infringement and one count of mail fraud, this Court sentenced Mr. Gordon, and the First Circuit affirmed his convictions and his sentence.

In his motion for compassionate release, Mr. Gordon declaims the Government's decision to prosecute him. He asserts that "many things didn't add up." *Def.'s Mot.* at 2. He questions "the motivation of the US Government's interest in prosecuting a case involving, if not 'Orphan Works,' th[e]n at least 'out of print' motion pictures with no mainstream ready market and unlikely to ever have one." *Id.*

Mr. Gordon informs the Court that while at FMC Devens, he has had "plenty of time" to think about a conversation he had with Special Agent Loren Thresher of Homeland Security Investigations about a burglary ring in the Bangor, Maine area. *Id.* at 3-4. Mr. Gordon extensively quotes this conversation. *Id.* at 3. Mr. Gordon begins his conversation with Agent Thresher by saying that he would like to ask the

agent questions "that are not related to my case." *Id.* Agent Thresher replies that it "depends" and Mr. Gordon tells the agent that he will go ahead and ask and it will be up to Agent Thresher whether to respond. *Id.* Mr. Gordon then asks Agent Thresher whether he knows a man named Jonathan Tardiff and goes on to describe a shoplifting ring in which a couple of guys "paid a bunch of drug users and homeless people to steal stuff from Walmart." *Id.* Mr. Gordon mentions another man named Anthony Berry as one of the leaders of the shoplifting ring. *Id.* Mr. Gordon notes that there is a police officer at the Brewer Police Department named Thom Tardiff and he wondered whether Officer Tardiff was related to Jonathan Tardiff. *Id.* Agent Thresher replied that he did not know. *Id.*

Mr. Gordon writes that he filed Freedom of Information Act (FOIA) requests "with the Maine State Police, the Brewer Police Department, and the Maine offices of the Department of Homeland Security and the Department of Justice." *Id.* at 4. Indeed, he attached copies of his nineteen FOIA requests to his motion. *See Def.'s Mot.* Attachs. 15-34. In his FOIA requests, Mr. Gordon asks various public agencies for information about himself, his former business (Edge Video), and about Anthony G. Berry, a person involved in the Bangor, Maine burglary ring. *Id.*

Mr. Gordon explains his "hope to obtain more pieces of the now obvious and intriguing puzzle: What was the US Government's REAL motivation for investigating and prosecuting Mr. Gordon for 'criminal copyright infringement'?" *Id.* Although Mr. Gordon disavows attempting "to challenge the conviction or re-try the case," he says

that there is a "hint of circumstantial evidence of a pretextual investigation and a vindictive prosecution." *Id*. at 4.

The Court is nonplussed. Whatever he may think, Mr. Gordon is not the victim of his own crime. First, Mr. Gordon seems to insinuate some improper relationship between his federal prosecution and the federal prosecution of a member of the Bangor burglary ring. As the judge who presided over the federal prosecution of one of the defendants in the burglary ring,[6] the Court is aware of no relationship and, if there is some connection, Mr. Gordon does not explain what it would be. Furthermore, the Court does not know how any of this would have affected the Government's decision to prosecute him for copyright infringement and mail fraud or how all of this relates to his pending petition for compassionate release.

As noted earlier, during trial, Mr. Gordon testified he had the right to copy so-called orphan works and that his use of the copyrighted movies was fair use. *Tr. of Proceedings*, *VII* at 1365:15-1553:2. At the close of trial, the Court instructed the jury on the law on fair use, orphan works, public domain, and similar concepts of copyright law. *Id*. at 1542:1-1545:24. For example, the Court instructed the jury that "United States copyright law does not recognize the concept of orphan work." *Id*. 1545:19-20. These instructions were, to the Court's knowledge, correct as a matter of law. In his motion, Mr. Gordon writes, "What was the motivation of the US Government's interest in prosecuting a case involving, if not 'Orphan Works', [then] at least 'out of print' motion pictures with no mainstream ready market and unlikely to ever have

---

[6]  *See United States v. Anthony G. Berry*, 1:17-cr-33-JAW-1.

one?"  *Def.'s Mot.* at 2.   But the Government's contention that Mr. Gordon was violating copyright law and Mr. Gordon's defense that he was legally entitled to copy and distribute the movies had been the focus of the seven-day-long trial in October 2019.   Mr. Gordon was given a free hand to defend himself and contradict the Government's case and the jury found him guilty as charged.   Mr. Gordon appealed his convictions and sentence and the Court of Appeals affirmed both.

Given Mr. Gordon's own statements in his motion, his self-justification for his criminal activity, his oblique contention that he was the subject of a pretextual and vindictive prosecution, the Court is concerned that even now, Mr. Gordon has not yet gotten the message that his conduct was indeed criminal.   Having read his motion, the Court is more concerned now than it was when it sentenced him that Mr. Gordon will recidivate upon release, because he does not believe that the law applies to him.

Mr. Gordon is of course entitled to his own opinions, and the Court understands that he went to trial and was convicted of these crimes.   He did not plead guilty and, to the Court's knowledge, he has never accepted his own culpability.   The Court is not requiring Mr. Gordon to believe something he does not believe, or even to pretend that he does, in order to be released.   But it is one thing for Mr. Gordon to maintain his innocence.   It is another to suggest that the federal prosecutor engaged in a vindictive prosecution and to darkly imply some nefarious conspiracy in the investigation and prosecution of a seemingly wholly unrelated criminal matter.

Notwithstanding the fact that Mr. Gordon is an active participant in the FMC Devens community and "has no disciplinary actions and also maintained a minimum

recidivism score (the lowest score possible)," the Court also considered the need to protect the public and the need for deterrence. *Def.'s Mot.* at 4. In instances such as this where the defendant is involved in a lengthy and extensive crime, the completion of a substantial sentence is necessary to reflect its seriousness, to deter the defendant from committing similar conduct upon release, and to prevent others from engaging in comparable criminal behavior.

Mr. Gordon argues that his "chronic right leg stump sores" are the "overriding factor under § 3553(a) that was not present at the time of sentencing." *Def.'s Reply* at 9. The Court, however, expressly considered Mr. Gordon's health conditions, including his stump leg, when sentencing him to a substantially reduced sentence of 60 months from the guideline range of 108 to 132 months and providing him a delayed self-report to the BOP six months after sentencing. *Sentencing Tr.* at 62:4-5; 81:9-24. Moreover, Mr. Gordon has presently served only approximately one quarter of his sentence. The fact that Mr. Gordon has not yet served a significant portion of his already reduced sentence as compared to the guidelines weighs against release. *See United States v. Patten*, 560 F. Supp. 3d 613, 618 (D.N.H. 2021) (specifying that because the defendant "has served a significant portion of his original sentence and is nearing his release date from BOP, a reduction in his sentence would not be inconsistent with the goals of promoting . . . deterrence"). The Court finds that serving only a quarter of this sentence does not reflect the extent of the crime and would not be sufficient to achieve general and specific deterrence. Thus, on balance, the 18 U.S.C. § 3553(a) factors do not weigh in favor of Mr. Gordon's release.

Finally, Mr. Gordon cites *Concepcion*, arguing that "[l]ooking at all of the above evidence in the light of the Concepcion decision puts a potential new spin on re-sentencing the Defendant through the form of a Compassionate Release." *Def.'s Mot.* at 5 (citing 142 S. Ct. at 2389). However, *Concepcion* is inapplicable here because its holding applies only to resentencing under § 404(b) of the First Step Act. Mr. Gordon is seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A). Even if *Concepcion* applied, however, the Court sees no intervening changes in law or fact that render Mr. Gordon's circumstance "extraordinary and compelling."

## C.     Summary

The Court concludes that Mr. Gordon has not met his burden to show extraordinary and compelling reasons for compassionate release, nor do the section 3553(a) factors support release. The Court finds that while his medical conditions heighten his risk from COVID-19, they do not present a "compelling and extraordinary" circumstance, and the Court finds that releasing Mr. Gordon early would contravene the § 3553(a) factors. On the record before the Court, Mr. Gordon is not an appropriate candidate for compassionate release at this time. Nevertheless, the Court is dismissing his motion without prejudice so that if Mr. Gordon wishes to return to the Court for compassionate release at some point in the future, having served more of his sentence and perhaps having reconsidered or better explained some of the positions he has taken in this motion, he is free to do so.

## V.    CONCLUSION

The Court DISMISSES without prejudice Douglas Gordon's Motion for Compassionate Release (ECF No. 230).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 31st day of October, 2022.